**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **GLORIA NAVARRO, et al.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:24-CV-968** |
| | § | |
| **APOLONIO GOMEZ,** | § | |
| **Defendant.** | § | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

### I.     MOTION

Defendant Apolonio Gomez asserts that there are no genuine issues of material fact for trial and requests that this Court grant summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(b). In support of his motion, Gomez relies on the following:

> **Exhibit 1:**     **Gomez Dash Camera Footage;**
>
> **Exhibit 2:**     **Rebecca Wilke Cellphone Video;**
>
> **Exhibit 3:**     **KSAT Witness Videos;**
>
> **Exhibit 4:**     **Case File for Cause No. 2020CR2300, in the 144th District Court of Bexar County, Texas.**

### II.     STATEMENT OF THE CASE

This lawsuit concerns wrongful death and survival actions arising from Defendant Gomez' use of deadly force against Luis Navarro, deceased.[1] Plaintiffs are Luis Navarro's parents and his "sole statutory heir," a minor child represented by parent and next friend

---

[1]        Doc. 24 at ⁋⁋ 25-30.

Heather Meyer.[2] Defendant is Texas State Trooper employed by the Texas Department of Public Safety.[3] Plaintiffs seek damages and fees.[4]

## III. STATEMENT OF MATERIAL FACTS

### A. The Dash Cam

On April 29, 2024, State Trooper Apolonio Gomez was patrolling along Interstate 35 in Comal County, Texas.[5] Luis Navarro, driving a minivan with blacked out windows, sped past Gomez on the left, immediately engaging Gomez' attention.[6] Approximately thirty seconds later, Gomez activated his lights, triggering the sound recording on his dash camera, and Navarro promptly shifted into the left lane, abruptly cutting off a black SUV.[7] Gomez then activated his siren, and Navarro fled.[8]

Court records reflect that Navarro was at the time subject to a motion to revoke his community supervision.[9] Navarro's community supervision was a consequence of his aggravated assault, with a firearm, of Plaintiffs Gloria Navarro and Heather Meyer.[10] Included in the terms of Navarro's community supervision were orders to "[n]either

---

[2]  Id. at ¶¶ 1-2.

[3]  Id. at ¶ 4.

[4]  Id. at ¶ 36.

[5]  Exhibit 1.

[6]  Id at 01:26-33.

[7]  Id. at 02:00-02.

[8]  Id. at 02:04.

[9]  Exhibit 4 at 0062-0063.

[10]  Id. at 0067-0069.

commit nor be convicted of any offense against the Laws of the State of Texas," and to "[r]emain within Bexar County, Texas."[11] Navarro, at minimum in violation of traffic laws and found driving in Comal County, had therefore violated even more terms of his community supervision when Trooper Gomez attempted to perform this traffic stop, and would almost certainly go to prison if caught.

Navarro proceeded to terrorize the highways northeast of San Antonio for the next thirteen minutes. He began by darting across all lanes of traffic on I-35 to feign exiting, and then cutting all the way back over at high speed.[12] Then he tailgated a pickup, on and off the shoulder, eventually forcing that motorist off the road.[13] He continued fleeing along I-35 for miles, passing dozens of vehicles on the shoulder, erratically weaving through dense traffic, and causing numerous motorists to suddenly brake and take evasive action to avoid collisions.[14]

Navarro eventually entered a construction zone and encountered heavier traffic, but only became more aggressive in evading Trooper Gomez, who became trapped by a large truck.[15] When Gomez caught up, Navarro forced his way through traffic to exit onto Loop 1604, brake-checking Gomez before entering the highway.[16] Navarro then took another

---

[11]     Id. at 0064.

[12]     Exhibit 1 at 02:25-30.

[13]     Id. at 02:38-50.

[14]     Id. at 02:50-07:59.

[15]     Id. at 08:00-09:40.

[16]     Id. at 10:03-39.

exit and made a U-turn, after which Gomez attempted a precision immobilization technique (colloquially, "PIT"), but Navarro again sped away unabated.[17]

Next, Navarro blasted through an active construction zone, with workers present and mere feet away from his careening vehicle, using blocked lanes to force his way past other motorists.[18] After again entering Loop 1604, Navarro continued his dangerous flight, faking exits and then swerving back, commandeering traffic lanes from behind, and forcing more motorists off the road.[19] Upon finding clearer road, Navarro continued down Loop 1604 for another minute and a half at a high rate of speed, weaving, passing on the shoulders, and abruptly cutting other motorists off.[20] Finally, Navarro veered in front of a large truck, which was forced to lock up its brakes, and smashed head-on into a white SUV.[21]

While his crashed minivan was still rolling, Navarro jumped out of the vehicle, and Gomez yelled, "Get on the fucking ground now!"[22] Navarro turned and ran instead, after which Gomez can be heard exiting his vehicle and shouting, "Get on the fucking ground before I shoot your fucking ass!"[23] Gomez can then be heard shouting at least five more

---

[17]     Id. at 11:08-35.

[18]     Id. at 11:35-12:08.

[19]     Id. at 12:08-53.

[20]     Id. at 12:53-14:35.

[21]     Id. at 14:35-40.

[22]     Id. at 14:45-47.

[23]     Id. at 14:47-50.

orders over the next ten seconds for Navarro to get on the ground, while Navarro can be heard shouting back.[24]

At Timestamp 15:01-04 on Gomez' dash camera, the sound of a Taser deploying can distinctly be heard, followed by Gomez again commanding Navarro to "get on the ground." The audio continues as follows:

- Navarro: "What's up then? What's up then? What's up?" (15:04-06).

- Gomez: "Come at me again! Come at me again!" (15:06-08).

- (Both men shouting unintelligibly) (15:08-11).

- Gomez: "Get on the fucking ground! Get on the fucking … No! Get on the fucking ground! Get on the fucking ground!" (15:11-15).

- Navarro: "Let me …" (15:16).

At Timestamp 15:16 a shot is heard, followed by two more orders for Navarro to get on the ground, and finally an order to "give me your fucking hands."[25]

**B. The Wilke Video**

Exhibit 2 is a cellphone video recorded by a witness named Rebekah Wilke. Trooper Gomez' gunshot takes place fourteen seconds into this video, and so logically the beginning of the Wilke video corresponds to Timestamp 15:02 of the Dash Cam Video.

At the beginning of the Wilke Video, Navarro can be seen running away from the vehicles, with Trooper Gomez in pursuit.[26] During the corresponding time on the Dash

---

[24]     Id. at 14:50-15:01.

[25]     Id. at 15:16-24.

[26]     Exhibit 2 at 00:00-02.

Cam Video, the Taser was being deployed, and Gomez was commanding Navarro for at least the eighth time to "get on the ground."[27] At Timestamp 00:03-04 of the Wilke Video, Navarro wheeled around and began rapidly advancing on Gomez, while Gomez just as rapidly backpedaled. During the corresponding time on the Dash Cam Video, Navarro was shouting, "What's up then? What's up then? What's up?"[28] At Timestamp 00:04-05 of the Wilke Video, Gomez, while still backpedaling, unholstered his firearm, while Navarro, still advancing and holding a shirt in his right hand, simultaneously extended his left arm toward Gomez. During the corresponding time on the Dash Cam Video, Gomez was shouting, "Come at me again! Come at me again!"[29]

At Timestamp 00:09-11 of the Wilke Video, Navarro brought his right arm up, moved the shirt into his left hand, and then continued to hold his left arm directly out toward Gomez while grasping the shirt. During the corresponding time on the Dash Cam Video, Gomez was repeatedly ordering Navarro to get on the ground.[30] At Timestamp 00:14-24 of the Wilke Video, Trooper Gomez shot Navarro once and then moved in to place Navarro in handcuffs.

### C. The KSAT Video

Exhibit 3 is a compilation of two cellphone videos obtained by KSAT, a local television station in San Antonio. The first of these videos is a poorer quality version of

---

[27]    Exhibit 1 at 15:02-04.

[28]    Id. at 15:05-06.

[29]    Id. at 15:06-07.

[30]    Id. at 15:11-13.

the Wilke Video.[31] The second video was recorded by a different witness from a different angle, and it is this video that Defendant refers to as the "KSAT Video."[32] Trooper Gomez' gunshot takes place four seconds into this video, and so logically the beginning of the KSAT video corresponds to Timestamp 15:12 of the Dash Cam Video.

At the beginning of the KSAT video, Gomez and Navarro can be seen facing each other in close proximity. A woman was sitting on the ground approximately two yards to Navarro's right, and two other innocents are situated behind the SUV Navarro hit.[33] Over the next four seconds, Navarro did the following:

- Took three steps toward Trooper Gomez, and two steps toward the woman. (01:24-28).

- Pointed with his bloody right hand at the woman, who was cringing and inching away. (01:26-28).

- Held out his left arm directly toward Gomez, with his left hand obscured behind a shirt. (01:27-28).

Meanwhile, during the same four seconds just prior to shooting Navarro, Gomez took five steps backward and three steps toward the woman,[34] and shouted multiple unheeded orders for Navarro get on the ground.[35]

---

[31]     Exhibit 3 at 00:25-01:09.

[32]     Id. at 01:24-52.

[33]     Id. at 01:24.

[34]     Id. at 01:24-28.

[35]     Exhibit 1 at 15:12-16.

## IV.    ARGUMENT

### A.  Standards

#### 1.  Summary Judgment

Summary judgment should be granted when the moving party conclusively establishes that there is no genuine issue of material fact.[36] There is no issue for resolution at trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.[37] The moving party may satisfy its burden by negating the existence of an essential element of the nonmoving party's case.[38] Alternatively, if the moving party will not bear the burden of proof at trial on a particular issue, it may meet its initial burden merely by pointing out the absence of evidence supporting that element of the nonmoving party's case.[39]

Once the moving party has carried its burden, the burden shifts to the nonmoving party to show that summary judgment is not appropriate.[40] The nonmoving party cannot discharge its burden by alleging mere legal conclusions or unsubstantiated assertions; it must present affirmative evidence to defeat a properly supported motion for summary judgment.[41]

---

[36]    FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986).

[37]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

[38]    Celotex Corp., 477 U.S. at 325.

[39]    Id.; Stults v. Conoco, Inc., 76 F.3d 651, 656 (5th Cir. 1996); Transamerica Ins. Co. v. Avenall, 66 F.3d 715, 718-719 (5th Cir. 1995).

[40]    Exxon Corp. v. Baton Rouge Oil, 77 F.3d 850, 853 (5th Cir. 1996).

[41]    Anderson, 477 U.S. at 249-250; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## 2. Qualified Immunity

Trooper Gomez invokes his entitlement to qualified immunity. When suing government officials, plaintiffs bear the burden of demonstrating that such a defendant is not entitled to qualified immunity.[42] Qualified immunity shields government officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[43] Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.[44] Courts are required to undertake a two-step analysis of the issue of qualified immunity: (1) whether a constitutional right was violated, and (2) "whether the defendant's actions violated clearly established . . . constitutional rights of which a reasonable person would have known."[45] "The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law."[46] This analysis may be performed in any order, and failure to establish any element is dispositive in favor of qualified immunity.[47]

---

[42]    Wyatt v. Fletcher, 718 F.3d 496, 502 (5th Cir. 2013).

[43]    Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[44]    Malley v. Briggs, 475 U.S. 335, 341 (1986).

[45]    Flores v. City of Palacios, 381 F.3d 391, 395 (5th Cir. 2004).

[46]    Hare v. City of Corinth, Miss., 135 F.3d 320, 328 (5th Cir. 1998) (emphasis omitted).

[47]    Pearson v. Callahan, 555 U.S. 223, 236 (2009); Saucier v. Katz, 533 U.S. 194, 201 (2001).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[48] "[E]xisting precedent must have placed the statutory or constitutional question beyond debate."[49] The Supreme Court has repeatedly stressed that a clearly established right must be defined with specificity, and not at a high level of generality.[50]

The Supreme Court has also repeatedly counseled that constitutional law is clearly established for qualified immunity purposes in only two ways: Supreme Court precedent or a "robust consensus of cases of persuasive authority" across the Courts of Appeals.[51] By either path, the relevant precedent must "squarely govern" the facts at hand.[52]

### 3. Excessive Force

Excessive force by law enforcement is an unreasonable seizure in violation of the Fourth Amendment.[53] To state a Fourth Amendment excessive force claim under 42 U.S.C. § 1983, plaintiffs must demonstrate (1) an injury, (2) resulting directly and only from a clearly excessive use of force, (3) the excessiveness of which was clearly unreasonable.[54]

---

[48] Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up).

[49] Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

[50] City of Escondido v. Emmons, 586 U.S. 38, 42-43 (2019) (citing Kisela v. Hughes, 584 U.S. 100, 104 (2018)).

[51] al-Kidd, 563 U.S. at 742; see also City & County of San Francisco v. Sheehan, 575 U.S. 600, 617 (2015); Taylor v. Barkes, 575 U.S. 822, 826 (2015).

[52] Mullenix v. Luna, 577 U.S. 7, 13 (2015) (quoting Brosseau v. Haugen, 543 U.S. 194, 201 (2004)).

[53] Graham v. Connor, 490 U.S. 386, 394-95 (1989).

[54] Cooper v. Brown, 844 F.3d 517, 522 (5th Cir. 2016).

The injury element is satisfied "when it results from a degree of force that is constitutionally impermissible – that is, objectively unreasonable under the circumstances."[55] "[I]nquiries regarding whether a use of force was 'clearly excessive' or 'clearly unreasonable … are often intertwined,'" and it is proper to consider those questions together.[56]

Courts must determine the reasonableness of a use of force "from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."[57] The analysis "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[58] This inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[59] Regardless of whether a use of force is deadly or otherwise, the reviewing court must consider the totality of the circumstances.[60]

---

[55] Bush v. Strain, 513 F.3d 492, 501 (5th Cir. 2008).

[56] Hanks v. Rogers, 853 F.3d 738, 744 (5th Cir. 2017) (quoting Poole v. City of Shreveport, 691 F.3d 624, 628 (5th Cir. 2012)).

[57] Graham, 490 U.S. at 396.

[58] Id. at 396-97.

[59] Id. at 396.

[60] Barnes v. Felix, __ F.4th __, 2025 U.S. App. LEXIS 24233, 2025 WL 2674139 (5th Cir. 2025) (applying the Supreme Court's recent decision to overrule the Fifth Circuit's longstanding "moment-of-threat" rule).

Ultimately, a use of force should be measured "under the facts as a reasonable officer *would perceive them*."[61] In the qualified immunity context, the Court should consider "only the facts that were knowable to the defendant officers."[62]

## B. Application to the Shooting of Luis Navarro

### 1. Constitutional Violation

Trooper Gomez incorporates his statement of material facts, and the evidence cited therein for the purposes of this analysis. The summary judgment evidence before the Court demonstrates that Gomez attempted to perform a routine traffic stop on April 29, 2024, and Luis Navarro decided to flee. Last month, the Fifth Circuit took note of and agreed with an earnest concurrence authored by Justice Kavanaugh, in which "he emphasized the weight courts should give to a suspect's flight, however innocuous the initial reason for the stop might be."[63] In analyzing a qualified immunity defense in these types of cases, courts "'must appreciate the extraordinary dangers and risks facing police officers and the community at large' when a 'driver has suddenly pulled away.'"[64]

This case illustrates well why, when a motorist demonstrates his intent to flee from a traffic stop, a reasonable police officer may conclude, "[i]n that moment," that the

---

[61]    <u>Griggs v. Brewer</u>, 841 F.3d 308, 313 (5th Cir. 2016) (emphasis in original) (citing <u>Hill v. Carroll Cnty., Miss.</u>, 587 F.3d 230, 234 (5th Cir. 2009)).

[62]    <u>White v. Pauly</u>, 580 U.S. 73, 76-77 (2017) (citing <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 399 (2015)).

[63]    <u>Barnes</u>, 2025 U.S. App. LEXIS 24233 at *4 (citing <u>Barnes v. Felix</u>, 605 U.S. 73, 84-90 (2025) (Kavanaugh, J, concurring)).

[64]    <u>Barnes</u>, 2025 U.S. App. LEXIS 24233 at *5 (quoting <u>Barnes</u>, 605 U.S. at 90).

motorist "'pose[s] a deadly threat for others on the road.'"[65] After fleeing Gomez' attempted stop, Navarro hurtled his vehicle up, down, and across two crowded highways, forcing his way past over 200 innocent motorists and unprotected construction workers.[66] It was only when Navarro crashed into one of those innocent motorists at high speed that the *initial* stage of his deadly conduct came to an end.

But Navarro was not finished. Based upon the compilation of video evidence before the Court, it is indisputable that Navarro jumped out of his vehicle and resumed his flight on foot.[67] Even though Navarro had thus far demonstrated his willingness to wantonly place the entire community in mortal danger, and had made no effort whatsoever to surrender, Trooper Gomez first attempted to terminate the encounter by use of a Taser.[68] Navarro's reaction was to turn and charge at Gomez, prompting the latter to quickly backpedal and unholster his firearm.[69]

During the next nine to ten seconds Navarro continued to step toward either the woman on the ground, cringing in terror, or Gomez, a man of much smaller stature.[70] Navarro pointed his left arm directly out toward Gomez.[71] At all times, Navarro grasped a shirt in one of his hands, first his right and then his extended left, depriving Gomez of the

---

[65]    Id. at *8 (quoting Plumhoff v. Rickard, 572 U.S. 765, 777 (2014)).

[66]    See Exhibit 1 at 02:00-14:40.

[67]    Id. at 14:45-50; Exhibit 2 at 00:00-02.

[68]    Exhibit 1 at 15:01-04.

[69]    Exhibit 2 at 00:03-04.

[70]    Id. at 00:04-13; Exhibit 3 at 01:24-28.

[71]    Ids.

ability to see *both* hands at any one time, or to otherwise determine if Navarro lacked a weapon.[72] Navarro never did anything that could reasonably be interpreted as an indication of surrender or abandonment of his continued, active resistance to arrest.[73]

The facts before the Court fit comfortably within Fifth Circuit precedent finding no constitutional violations for uses of deadly force. At the threshold, Gomez asserts that the constitutional question in this case need not even reach the issue of Navarro's potential possession of a weapon, or Gomez' reasonable belief thereof. That is because "[a]n officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others."[74] Navarro had thoroughly demonstrated that threat of serious harm by leading Gomez on a highly dangerous vehicle pursuit, crashing into innocent motorists at high speed, rushing at and continuing to advance on Gomez, ignoring all orders to surrender, and continuing to actively resist arrest with at least three innocents in close proximity.

The Fifth Circuit has found no constitutional violation in cases where the suspect undisputedly possessed no weapon of his own but used an advantage in size to physically overwhelm the officer and potentially gain control of the officer's weapon.[75] That is exactly the specter faced by Trooper Gomez in this case. Luis Navarro, a comparatively huge man, rushed at Gomez, necessitating quick evasive action and the display of a firearm. Navarro, who *still* ignored commands and continued to walk forward thereafter, presented Gomez

---

[72]     Ids.

[73]     Ids.

[74]     <u>Ontiveras v. City of Rosenberg</u>, 564 F.3d 379, 382 (5th Cir. 2009).

[75]     <u>Orr v. Copeland</u>, 844 F.3d 484, 493-94 (5th Cir. 2016).

with a choice between risking a highly disadvantageous physical encounter or using deadly force, which was the only reasonable means he had left to terminate Navarro's rampage. Gomez "was not obligated to give [Navarro] a second chance" to rush the Trooper and physically overwhelm him.[76]

While this case need not turn on weapon possession or the perception thereof, precedent regarding that issue only makes it clearer that Trooper Gomez acted constitutionally. For example, in <u>Argueta v. Jaradi</u>, the decedent was pulled over by police, jumped out of his car, and ran away.[77] After approximately five seconds, an officer shot and killed the still-running suspect.[78] The Fifth Circuit found no constitutional violation because video evidence demonstrated that Argueta concealed one of his hands during the encounter, and so the officer could reasonably believe that Argueta possessed a weapon.[79] The Fifth Circuit deemed it immaterial that Argueta was ultimately found to possess a handgun, because "by suspiciously concealing his right arm as he fled in a way that objectively suggested he was armed and dangerous, he engaged in a furtive gesture justifying deadly force."[80]

---

[76]     <u>McVae v. Perez</u>, 120 F.4th 487, 494 (5th Cir. 2024) (cert. denied by 145 S.Ct. 2753 (2025)).

[77]     <u>Argueta v. Jaradi</u>, 86 F.4th 1084, 1087 (5th Cir. 2023) (cert. denied by 145 S.Ct. 435 (2024)).

[78]     <u>Id.</u>

[79]     <u>Id.</u> at 1090-94.

[80]     <u>Id.</u> at 1093.

The Argueta majority distinguished those facts from the Fifth Circuit's decision in Poole v. City of Shreveport,[81] where a use of deadly force did violate the Constitution. In Poole, the suspect showed *both* empty hands to the officer upon command, opened the door of his truck, sat in the driver's seat, and was shot.[82] Poole went against the officer because "the suspect was visibly unarmed," and did not involve any "furtive gesture."[83]

In this case, like Argueta, the video evidence demonstrates that Gomez could never confirm that Navarro was "visibly unarmed," because one hand was deliberately concealed at all times. Further, Navarro made a "furtive gesture" by extending a concealed hand toward Gomez from mere feet away, appearing exactly like he is pointing a weapon at Gomez.



[81]   Poole v. Shreveport, 13 F.4th 420 (5th Cir. 2021).

[82]   Id. at 422.

[83]   Argueta, 86 F.4th at 1091-92.

Unlike Argueta, this encounter followed a lengthy high-speed chase, unsuccessful Taser deployment, and a rapid physical advance against the officer. Additionally, this case involved the presence of innocent civilians in close proximity, also potentially endangered by Navarro's continued aggressive resistance.

Next, the Court may look to Salinas v. City of Houston, wherein a driver led police in a high-speed pursuit, ending with a freeway crash.[84] The officers then surrounded the suspect vehicle and issued repeated commands to see the driver's hands.[85] Over the next thirty-eight seconds the driver raised his hands intermittently, and then dropped them out of view and moved around in his vehicle.[86] Finally, the driver appeared to reach for something behind his seat, and was shot.[87]

The Salinas Court found no constitutional violation because, as in this case, the suspect ignored the officers' repeated commands and continued putting his hands out of their view.[88] Lethal force is justified in these factual scenarios, "even in cases when officers had not yet seen a gun when they fired, or when no gun was ever found at the scene."[89] And again, this case includes additional factors, to include the fact that Navarro *never* indicated surrender, *never* showed both of his hands, resisted a Taser deployment, rushed

---

[84]   Salinas v. City of Houston, 138 F.4th 822 (5th Cir. 2025) (no petition for cert.).

[85]   Id. at 827.

[86]   Id.

[87]   Id.

[88]   Id. at 832.

[89]   Id. (quoting Cloud v. Stone, 993 F.3d 379, 387 (5th Cir. 2021) (also citing Manis v. Lawson, 585 F.3d 839, 844 (5th Cir. 2009)).

at and continued to advance on the police officer, and endangered innocents in close proximity.

The <u>Graham</u> factors are all very clearly resolved in Gomez' favor.[90] By the time he was shot, Luis Navarro had committed countless severe crimes, including but not limited to violations of the terms of his community supervision, reckless driving, criminal speeding, evading police, and resisting arrest. He posed an immediate threat to the safety of Trooper Gomez and others, first by his deadly flight, and then by attacking Gomez without any indication of retreat or surrender. And obviously, throughout this entire episode, Navarro actively resisted arrest *and* attempted to evade arrest by flight. Gomez therefore did not violate the Fourth Amendment when he shot Navarro, and he is entitled to qualified immunity.

### 2. Clearly Established Law

The question of whether Gomez violated clearly established law "is a doozy" for which Plaintiffs bear a heavy burden of proof.[91] Excessive force "is an area of law 'in which the result depends very much on the facts of each case' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts of the case."[92] As illustrated here, "excessive-force claims often turn on 'split-second decisions' to use lethal force," and so "the law must be so clearly established that – in the

---

90      <u>See Graham</u>, 490 U.S. at 396.

91      <u>Morrow v. Meachum</u>, 917 F.3d 870, 874 (5th Cir. 2019) (citations omitted).

92      <u>Kisela</u>, 584 U.S. at 104 (quoting <u>Mullenix</u>, 577 U.S. at 13).

blink of an eye … – every reasonable officer would know it immediately."[93] The constitutional question must be "frame[d] … with specificity and granularity."[94]

Plaintiffs have thus far not attempted to satisfy the clearly established law requirement at all.[95] After a good-faith search, Gomez has been unable to find any Supreme Court precedent or "robust consensus of cases of persuasive authority" which would have "placed the statutory or constitutional question beyond debate" that he committed a constitutional violation on April 29, 2024.[96] Specifically, Gomez can find no such precedent where, as here, it has been deemed unconstitutional to use deadly force against a suspect who leads police on a lengthy vehicle pursuit, ignores all verbal commands, continually and actively resists arrest, is impervious to a Taser deployment, charges at the officer, extends a concealed hand at the officer, continues to advance on the officer with no indication of surrender or retreat, leverages a clear advantage in physical size, and utterly disregards the safety of nearby innocents.

The Fifth Circuit, to the contrary, has affirmed qualified immunity in much less clear-cut circumstances. For example, in Batyukova v. Doege, an off-duty Bexar County Deputy Sheriff came upon a vehicle stopped in the left lane of U.S. 90.[97] Inessa Batyukova exited her vehicle and became verbally aggressive, ignoring the deputy's commands, and

---

[93]     Morrow, 917 F.3d at 876 (quoting Pasco ex rel. Pasco v. Knoblauch, 566 F.3d 572, 582 (5th Cir. 2009)).

[94]     Id. at 874-5.

[95]     See Doc. 24.

[96]     al-Kidd, 563 U.S. at 741-42.

[97]     Batyukova v. Doege, 994 F.3d 717 (5th Cir. 2021).

walking toward the deputy's car.[98] The deputy backed up to gain space, got out of his car, and issued commands to "get down now" and "let me see your hands."[99] Batyukova ignored him, moved one of her hands out of the deputy's view, and the deputy shot her.[100] The Fifth Circuit resolved that the law was not "sufficiently clear" to show that deadly force in this type of situation was unconstitutional, nor did the facts present an "obvious case" of unlawful conduct.[101]

It must again be noted that this matter includes many more facts weighing in favor of qualified immunity than those present in <u>Batyukova</u>. At the risk of repetition *ad nauseum*, Navarro also engaged in a high-speed chase, fled on foot, resisted a Taser, charged at the officer, kept a hand concealed at all times, pointed something indeterminate at the officer, was physically much larger than the officer, was situated much closer, and endangered nearby innocents. <u>Batyukova</u> can hardly be called a match, but represents more of a precedential floor, demonstrating just how far away from clearly established law this case is.

Plaintiffs have failed to meet their high burden of demonstrating that the law was clearly established concerning the facts of this case. Trooper Gomez is therefore entitled to qualified immunity.

---

[98]    <u>Id.</u> at 722.

[99]    <u>Id.</u>

[100]   <u>Id.</u> at 722-23.

[101]   <u>Id.</u> at 726-27.

## V.    PRAYER

Plaintiffs have failed to demonstrate either a constitutional violation in the shooting of Luis Navarro or that the law applicable to these facts was clearly established at the time of the incident. Plaintiffs cannot overcome Gomez' assertion of qualified immunity. Gomez respectfully requests summary judgment on all claims in this matter.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**BRIANA M. WEBB**
Acting Division Chief
Law Enforcement Defense Division

*/s/ CHRISTOPHER LEE LINDSEY*
**CHRISTOPHER LEE LINDSEY**
Assistant Attorney General
Attorney-In-Charge
State Bar No. 24065628

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2157 (Phone No.)
(512) 936-2109 (Fax No.)
christopher.lindsey@oag.texas.gov

**ATTORNEYS FOR APOLONIO GOMEZ**

## CERTIFICATE OF SERVICE

I, **CHRISTOPHER LEE LINDSEY**, Assistant Attorney General, do hereby certify that a true and correct copy of the foregoing has been served on all parties by the Court's electronic noticing system, on this the 17th day of October, 2025.

*/s/CHRISTOPHER LEE LINDSEY*
**CHRISTOPHER LEE LINDSEY**
Assistant Attorney General
